UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM SASSMAN,<br><br>    Plaintiff,<br><br>    v.<br><br>EDMUND G. BROWN, JR., Governor of California, and JEFFREY A. BEARD, Secretary of the California Department of Corrections and Rehabilitation, in their official capacities, and DOES 1-10,<br><br>    Defendants. | No. 2:14-cv-01679-MCE-KJN<br><br>**MEMORANDUM AND ORDER** |

    William Sassman ("Plaintiff") initiated this action against Edmund G. Brown, Jr., Governor of California, and Jeffrey A. Beard, Secretary of the California Department of Corrections and Rehabilitation, in their official capacities (collectively "Defendants"), and Does 1-10. Plaintiff claims Defendants' exclusion of men from California's Alternative Custody Program ("ACP"), as authorized by California Penal Code section 1170.05, violates the Equal Protection Clause of the Fourteenth Amendment. Presently before the Court is Plaintiff's motion for a preliminary injunction by which he seeks to enjoin Defendants from continuing to exclude Plaintiff and other male prisoners from the ACP because of their gender. The Court heard argument from counsel for both sides on Wednesday, October 1, 2014, at 9:30 a.m. Upon consideration of the materials in the

record, as well as the arguments of counsel in open court, Plaintiff's motion was DENIED;[1] this written order follows.[2]

## BACKGROUND

Senate Bill No. 1266, adding California Penal Code section 1170.05, was signed into law on September 30, 2010. It provided for the implementation of the ACP, "a program under which <u>female inmates, pregnant inmates, or inmates who, immediately prior to incarceration, were primary caregivers of dependent children</u> . . . who have been committed to state prison may be allowed to participate in a voluntary alternative custody program . . . in lieu of confinement in state prison." S.B. 1266 § 2 (emphasis added).[3] Accordingly, the ACP was originally intended to be open to all female prisoners, but only to males who were "primary caregivers" of dependent children. Legislative findings

---

[1] The Court denied Plaintiffs' Motion on the record. To the extent that this order materially differs from the Court's ruling on October 1, 2014, the terms of this order control. Plaintiff and Defendants have each moved to strike several of each other's declarations filed in conjunction with the briefing on this motion. Plaintiff's motion (ECF No. 22) is DENIED without prejudice as moot because even if the Court considers Defendants' evidence, Plaintiff is still likely to succeed on the merits. Similarly, Defendants' motion (ECF No. 25) is DENIED without prejudice as moot as well because the Court did not need to consider the challenged evidence to conclude that Plaintiff is likely to succeed.

[2] Between the date of the hearing and the date this order was to issue, Plaintiff filed a Motion for Reconsideration (ECF No. 35) and Motion to Shorten Time (ECF No. 36) asking that the Court either reconsider its decision on the merits of the preliminary injunction motion or expedite the already truncated summary judgment briefing schedule the Court set during the hearing. Motions for reconsideration are addressed to the sounds discretion of the trial court. Turner v. Burlington N. Santa Fe. R.R., 338 F.3d 1058, 1063 (9th Cir. 2003). A district court may properly deny a motion for reconsideration that simply reiterates an argument already presented. Maraziti v. Thorpe, 52 F.3d 252, 255 (9th Cir. 1995). Plaintiff's Motion seeks only to re-litigate the issue of his mother's terminal illness, an issue the Court has already considered. Accordingly, Plaintiff's Motion for Reconsideration of the merits is DENIED. However, the Court will defer deciding whether a more expedited briefing schedule may be warranted until the Government has had a chance to respond. Plaintiff's Motion to Shorten Time is GRANTED. Not later than Thursday, October 16, 2014, the Government is ordered to respond to Plaintiff's request to further accelerate the discovery and summary judgment hearing schedule. Any Reply is due not later than 9:00 a.m. on Monday, October 20, 2014.

[3] An inmate must also meet the following gender-neutral criteria to be eligible to participate in the ACP: the person does not have a current conviction for a violent or serious felony, the person does not have a current or prior conviction for an offense that requires them to register as a sex offender, the person was screened and does not pose a high risk to commit a violent offense, and the person does not have a history, within the last 10 years, of escape from juvenile or adult custody. Cal. Penal Code § 1170.05(d); 15 CCR §§ 3078.2, 3078.3.

2

underlying the new law were as follows:

> The incarceration rate for female offenders has doubled over the last 20 years. As a result, California now has about 10,000 incarcerated women, which is more than any other state.
>
> Nearly 70 percent of female inmates are nonviolent offenders. Two-thirds of female inmates were convicted of property or drug-related crimes.
>
> While over half of the men in prison were incarcerated for violent crimes, only 30 percent of women were convicted of violence.
>
> Female inmates are more likely to be victims of violent crimes than to be the perpetrators. Four in 10 female inmates were physically or sexually abused before 18 years of age.
>
> Over two-thirds of women are classified as low risk by the prison classification system. However, women are often held in more secure environments than their custody classifications would warrant.
>
> Approximately 67 percent of incarcerated women are mothers, and many of them are single parents. Most of California's incarcerated mothers are the primary caregivers of dependent children and hope to return home to their children. While the vast majority of children of incarcerated men continue to live with their mothers, children of incarcerated women are more likely to end up living with other relatives or in foster care.
>
> <u>Separating parents from children has a substantial impact on their futures. Children of inmates are much more likely than their peers to become incarcerated.</u> Research suggests that mothers who are able to maintain a relationship with their children are less likely to return to prison. <u>Research also demonstrates that a father's involvement in his child's life greatly improves the child's chances for success. Helping incarcerated fathers foster stronger connections with their children, where appropriate, can have positive effects for children. Strong family connections help to ensure that fathers stay out of prison once they are released.</u>
>
> To break the cycle of incarceration, California must adopt policies that facilitate parenting and family reunification.

Section 1 of Stats. 2010, c. 644 (S.B. 1266) (emphasis added).

The next year, on September 12, 2011, CDCR formally launched the ACP. According to the CDCR, "[i]nitially, the program [would] be offered to qualifying female

3

inmates. Participation may be offered at a later date to male inmates, at the discretion of the Secretary of CDCR." Swearingen Decl. ¶ 7 & Ex. F. CDCR indicated it might at some point allow some men to participate in an effort to comply with court-ordered obligations to reduce inmate populations. Id., ¶ 8 & Ex. G.

Subsequently, on June 27, 2012, Governor Brown signed Senate Bill No. 1021, modifying Section 1170.05 to read: "[F]emale inmates sentenced to state prison for a determinate term of imprisonment pursuant to Section 1170, and only those persons, shall be eligible to participate in the Alternative Custody Program authorized by this section." Cal. Penal Code § 1170.05(c) (emphasis added). Shortly thereafter, on September 13, 2012, CDCR issued a notice of approval of emergency regulatory action providing that "[t]o be eligible to participate in the Alternative Custody Program (ACP), the inmate must volunteer and be female." 15 CCR § 3078.2(a).[4] During the public comment period, CDCR received a number of comments questioning whether the ACP impermissibly discriminates against men. The CDCR acknowledged that the program discriminates on the basis of sex, but took the position that the discrimination was permissible because male and female inmates are not similarly situated. Swearingen Decl. ¶ 10 & Ex. I, Comment and Response 5A (citing Woods v. Horton, 167 Cal. App. 4th 658, 671 (2008)).

To some extent, the parties disagree as to the purpose of the ACP. According to Plaintiff, the primary purpose of the program is to work toward family reunification. ECF No. 1 at 5. As a result, Plaintiff contends that there is no legitimate reason for excluding men from the program. ECF No. 5-1 at 17. For their part, Defendants argue that "gender makes a difference in prison management and administration." ECF No. 15 at 1. More specifically, Defendants point out that "CDCR recognizes that the pathways to criminality for females are significantly different from those of males." Id. at 2. For example, Defendants contend that "the most common pathways to crime for women are

---

[4] This was the only relevant change in the eligibility criteria; none of the gender-neutral exclusionary criteria were changed.

based on survival of abuse, poverty, and substance abuse . . . and female offenders are more likely to suffer from a history of physical or sexual abuse." Id.  Defendants offer a number of statistics to support their argument, such as "[f]ifty-seven percent of incarcerated women report physical or sexual abuse before imprisonment, compared to 16% of men," and "[r]oughly two-thirds of incarcerated women have a child under the age of eighteen." Id.  Defendants contend that children of incarcerated mothers are more likely to be placed in foster care than children of incarcerated fathers, who are more likely to be cared for by a mother or step-mother. Id. at 3.  Additionally, they contend that "most of California's incarcerated mothers are the primary caregivers of dependent children and will return home to their children." Id. (internal citations omitted). In sum, Defendants argue that "[t]he Alternative Custody Program is gender responsive, in that it is designed to address the ways in which female inmates are different from male inmates. Id. at 7.

On June 3, 2013, Plaintiff applied to the ACP, requesting that he be allowed to finish his sentence in his home community of Sacramento. ECF No. 1 at 6.  Plaintiff contends that, exclusive of his gender, he met and still meets all of the criteria required to be eligible to apply to the ACP. Id.  On June 19, 2013, a CDCR correctional counselor denied Plaintiff's application because he is male. Id.  Plaintiff appealed his ACP application denial through the third-level of review, and the CDCR denied the last appeal in December 2013. Id.  Plaintiff filed the instant action on July 16, 2014, and that same day filed his request for injunctive relief.

## STANDARD

A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right. Munaf v. Geren, 553 U.S. 674, 689 (2008).  Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter v. Natural Res. Def. Council, Inc.,

555 U.S. 7, 24 (2008) (internal citations and quotations omitted). The party requesting preliminary injunctive relief must establish: (1) that he is likely to succeed on the merits of his claim; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. Id. at 20. Alternatively, under the "serious questions" approach, a preliminary injunction is proper if there are "serious questions going to the merits" and a "balance of hardships that tips sharply towards the plaintiff . . . , so long as plaintiff also shows there is a likelihood of irreparable injury and the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

There are two types of injunctions. "A mandatory injunction orders a responsible party to take action, while a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a final resolution on the merits." Arizona Dream Act Coal. v. Brewer, 757 F.3d 1053, 1060 (9th Cir. 2014) (internal citations and quotations omitted). A mandatory injunction goes well beyond simply maintaining the status quo and is particularly disfavored. Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir. 1979). Mandatory preliminary relief should not be issued unless the facts and law clearly favor the moving party. Id. The court's finding of a strong likelihood that plaintiffs would succeed on the merits of their claims also evidences a conclusion that the law and facts clearly favor plaintiffs and meets the heightened burden required for issuance of a mandatory preliminary injunction. Katie A., ex rel. Ludin v. Los Angeles Cnty., 481 F.3d 1150, 1157 (9th Cir. 2007).

**ANALYSIS**

Plaintiff seeks an injunction requiring Defendants to consider Plaintiff's application for the ACP and prohibiting them from excluding men from the ACP based on their gender. ECF No. 1 at 9. Rather than preserve the status quo, Plaintiff asks the Court to change the status quo. See Heckler v. Lopez, 463 U.S. 1328, 1333 (1983) (a prohibitory

injunction merely "freezes the positions of the parties" until the case is heard on the merits). Plaintiff's requested injunctive relief is thus mandatory and is subject to a heightened burden of proof. Despite this higher burden, Plaintiff is still likely to succeed on the merits, and, consequently, the balance of hardships and public interest prongs also tip in his favor. However, Plaintiff has failed to show the requisite likelihood of imminent irreparable harm, and his application is thus DENIED.

### A. Likelihood of Success[5]

Plaintiff contends that "the State's blanket exclusion of men from ACP participation violates the Equal Protection Clause of the Fourteenth Amendment." ECF No. 5-1 at 14. "The Equal Protection Clause . . . commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Tex. V. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Pyler v. Does, 457 U.S. 202, 216 (1982)) (emphasis added). State policies that expressly discriminate among applicants on the basis of gender are "subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 723 (1982). Just because a statutory policy "discriminates against males rather than against females does not exempt it from scrutiny or reduce the standard of review." Id.

"[T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification." Id. at 724 (quoting Kirchberg v. Feenstra, 450 U.S. 455, 461 (1981)). "The burden is met only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are

---

[5] The Court is cognizant that Defendants take the position this issue has already been resolved. According to Defendants, in 2014, a three-judge court implicitly found the ACP to be constitutional. See ECF No. 15 at 20 (citing Plata v. Schwarzenegger, 3:01-cv-01351-TEH (N.D. Cal.), ECF No. 2766 at 3). The Court rejects this contention because that panel was not asked to rule on the constitutionality of the program. Instead, that court was only asked to approve the state's suggestions for ways to reduce overcrowding.

'substantially related to the achievement of those objectives.'" Id. (quoting Wengler v. Druggists Mutual Ins. Co., 446 U.S. 142, 150 (1980)).  This test "must be applied free of fixed notions concerning the roles and abilities of males and females.  Care must be taken in ascertaining whether the statutory objective itself reflects archaic and stereotypic notions." Id. at 724-25.

If a court finds that a State's objective is legitimate and important, the next step is to determine whether the discriminatory means are substantially related to the important governmental interest.  Id. at 725.  "The purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women." Id. at 725-26.

According to Plaintiff, he is likely to succeed on the merits because he is similarly situated to female inmates that are eligible for the program and the ACP's exclusion of men serves no important governmental objective.  ECF No. 5-1 at 16-17.   Defendants oppose Plaintiff's request for injunctive relief arguing: (1) Plaintiff is not similarly situated to female inmates applying and being accepted to the alternative custody program; and (2) "the penal code section establishing the Alternative Custody Program is a well-considered legislative response to the important governmental objectives of strengthening the bond between incarcerated women and their children and addressing the holistic needs of incarcerated women stemming from trauma, neglect, abuse, and addiction, and is substantially related to the achievement of those objectives."  ECF No. 15 at 10.  Plaintiff has the better argument.

### 1. Similarly Situated

Defendants claim that Plaintiff cannot succeed on the merits of his Equal Protection claim because he is not similarly situated to those female inmates applying for and being approved to participate in the ACP.  ECF No. 15 at 15.  Plaintiff, on the other hand, claims that he is similarly situated to female inmates for purposes of the ACP by referencing the gender-neutral exclusionary criteria contained within the implementing

8

1  regulations that ensure only low-risk, low-level offenders participate in the program.
2  More specifically, Plaintiff contends that because he qualifies to submit an application to
3  the ACP with reference to those criteria, he is similarly situated to females who qualify as
4  well.  Plaintiff's argument is well taken.

5  Defendants purport to focus on comparisons between Plaintiff and specific types
6  of female inmates that have been applying for and approved to participate in the ACP.
7  See ECF No. 15 at 25.  What Defendants actually argue, however, is that Plaintiff is not
8  similarly situated to female inmates who "are far more likely to be single caretakers of
9  dependent children," and who are more likely "to shield their children from detection by
10  state agencies."  Id. at 11.  In addition, Defendants contend that Plaintiff is not similarly
11  situated to female inmates because: (1) his children continue to live in the family home
12  with their mother; (2) his children visit him regularly; (3) Plaintiff does not allege he was
13  ever the primary caregiver of his children; (4) he cites no evidence demonstrating he
14  needs treatment and services, such as substance abuse treatment, parenting and life
15  skills counseling, anger management, etc.; and (5) "while the legislature noted that many
16  female inmates present a history of trauma or sexual victimization there is no evidence
17  to indicate that [Plaintiff] has experienced physical or sexual abuse."  ECF No. 15 at 17-
18  18.  These arguments miss the point because: (1) none of the female ACP participants
19  are required to make any of the showings Defendants apparently would have the Court
20  require of Plaintiff, and Defendants are, in effect, comparing Plaintiff to a hypothetical
21  participant who may have been admitted under the statute as originally enacted; and
22  (2) excluding males on the basis that females are "more likely" to be primary caregivers
23  and "more likely" to suffer from the effects of abuse runs directly contrary to the Supreme
24  Court's admonitions that courts should not rely on generalities.

25  First, Plaintiff must be similarly situated to those female inmates who would be
26  eligible for the ACP in order to bring an Equal Protection claim.  None of the criteria
27  listed under § 1170.05 require inmates to be mothers, to have substance abuse issues,
28  or to have been a victim of sexual abuse.  See Cal. Penal Code § 1170.05.  Accordingly,

9

any of Defendants' arguments requiring Plaintiff to make those showings, or the showings required by the statute as originally enacted, may be disregarded. Since Plaintiff has alleged that he meets all of the gender-neutral eligibility criteria required by the regulations, he is similarly situated to all other female inmates who must meet the same criteria.

Second, Defendants' argument regarding the unique qualities particular to female inmates that justify a female-only program is contrary to admonitions that the State not rely on gender stereotypes. See U.S. v. Virginia, 518 U.S. 515, 541 (1996) ("State actors controlling gates to opportunity . . . may not exclude qualified individuals based on fixed notions concerning the roles and abilities of males and females.") (internal citations and quotations omitted); Mississippi Univ. for Women, 458 U.S. at 724-25 (The test for determining validity of gender-based classification "must be applied free of fixed notions concerning the roles and abilities of males and females," and "archaic and stereotypic notions."). The Supreme Court in Mississippi University for Women found that assuming that "women, not men, should become nurses" was an unpersuasive policy founded on improper gender stereotypes. Id. at 730. Similarly here, assuming that female inmates and their families will benefit more from the ACP than male inmates and their families promulgates the notion that women, regardless of their specific circumstances, are more fit to parent and are more important to the family than men. The Court is not willing to perpetuate that stereotype.

Moreover, Defendants' case law does not compel a different conclusion. See ECF No. 15 at 15 (citing Klinger v. Dept. of Corr., 31 F.3d 727, 731 (8th Cir. 1994); Women Prisoners of the D.C. Dept. of Corr. v. District of Columbia, 93 F.3d 910, 923 (D.C. Cir. 1996); Pargo v. Elliot, 894 F. Supp. 1243, 1261 (S.D. Iowa 1995)). All of these cases dealt with female inmates at certain prisons challenging the programs available to male inmates at other prison facilities. In those cases, the courts found that the female inmates were not similarly situated to the male inmates primarily based on factors beyond gender, such as the different makeup of the prisons and other more objective

factors (e.g., "population size, security level, types of crimes, lengths of sentences," etc.). See Pargo, 894 F. Supp. at 1262. Indeed, those cases tend to focus on differences between prison structures, as opposed to the prisoners themselves. See Klinger, 31 F.3d at 731; Pargo, 894 F. Supp. at 1261. Because the ACP is not a program limited to a particular prison, and because the focus of Plaintiff's claim is not how prisoners at a certain facility are being favored, the similarly situated analysis does not bar consideration of the merits of Plaintiff's Equal Protection claim.

Even the authority on which Defendants most heavily rely, Woods, 167 Cal. App. 4th 658, cannot save their argument. Defendants claim that Woods is analogous here because in that case the Third District Court of Appeal upheld an inmate-mother alternative sentencing program in the face of an Equal Protection challenge. See ECF No. 15 at 16. Reliance on this case is misplaced, however, because it is non-binding, interprets the California Constitution, and deals with a statute that was specifically enacted not for all female inmates, but for pregnant inmates and inmate mothers with small children. See Woods, 167 Cal. App. 4th at 672. Further, the outcome in that case, with respect to the inmate-mother programs, turned in large part on the fact that the plaintiffs could not identify a single male inmate that would qualify for the program. Id. at 673-674. Here, to the contrary, Plaintiff has presented himself as an eligible male participant, and the ACP statute applies to all females, regardless of whether they are pregnant or mothers.[6]

None of the authority presented convinces the Court that, in this context, male and female inmates are anything other than similarly situated. To the contrary, Plaintiff has presented the Court with evidence that he meets the gender-neutral standards in order to be eligible to apply and participate in the program and that he is thus similarly situated to female inmates permitted to apply.

---

[6] Furthermore, the cases relied upon in Woods are the sort of factually distinguishable cases discussed above where courts compared prison programs and resources more than they compared the attributes of particular prisoners. Woods is that much more unpersuasive for having relied on inapposite case law.

### 2. Substantially Related to Important Governmental Interest

As written, the current ACP is not substantially related to an important government interest. When a statute classifies individuals based on gender, the government must carry the burden of showing an exceedingly persuasive justification for the classification. Mississippi Univ. for Women, 458 U.S. at 724. The Supreme Court has advised that "care must be taken in ascertaining whether the statutory objective itself reflects archaic and stereotypic notions." Id. at 724-725. In addition, the governmental objective must be "genuine, not hypothesized or invented *post hoc* in response to litigation." Virginia, 518 U.S. at 533.

Defendants argue that in enacting the ACP, the state legislature was especially concerned with characteristics of the typical female inmate, emphasizing that female inmates have a propensity to be primary caregivers of children. ECF No. at 19. Defendants rely heavily on the argument that "it is irrefutable that the legislature's intent was to design a program to serve women." Id. According to Defendants, the important governmental objectives behind the ACP are "strengthening the bond between incarcerated women and their children and addressing the holistic needs of incarcerated women . . . ." ECF No. 15 at 15. These arguments are not borne out by the record.

The original version of California Penal Code § 1170.05 opened the program up to men, which would not make sense if the program was only designed to serve women. See Cal. Penal Code § 1170.05 (stating program available to "female inmates, pregnant inmates, or inmates who were primary caregivers . . ."). Additionally, the legislative findings specifically addressed the need to help incarcerated fathers "foster stronger connections with their children," which suggests the program was not intended only for women. See Sections 1 of Stats.2010, c. 644 (S.B. 1266). Defendants' post-hoc explanations are thus unpersuasive.

Regardless, even assuming the state's interests are important, Defendants have failed to identify how their interests are served by excluding men. Even Defendants' own authority supports a contrary conclusion. In Woods, the Third District Court of Appeals

12

for California found there was no compelling state interest in excluding male inmates from a domestic violence program, even if it is true that women are more often the victims of those crimes. 167 Cal. App. 4th at 675. That Court reasoned that "equal protection is not concerned with numbers." Id. So to here, numbers are not enough to justify excluding men from the program.

In sum, CDCR has repeatedly made clear that the primary objectives of the ACP are family reunification and community reintegration. However, since all women are permitted to participate in the ACP, not just women with children, it is unclear how the statute furthers those goals. Moreover, this Court still cannot see how either goal is advanced by excluding male prisoners. To the contrary, it seems that permitting men to participate in the program would actually serve the State's objectives. Defendants have thus failed to show how the ACP can be substantially related to the State's interests of family reunification and community reintegration when, to apply, women need not be mothers, nor must they show a need for rehabilitation or recovery services aimed at substance abuse or domestic violence, but men, even if they show all of the foregoing, may not apply at all. Absent a closer connection between the statute and the goals it is intended to serve, Plaintiff is likely to succeed on the merits of his claim.[7]

**B. Likelihood of Irreparable Harm**

That said, Plaintiff has not shown the requisite likelihood of irreparable harm. Plaintiff must establish that "irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." Alliance for the Wild Rockies, 632 F.3d at 1131 (citing Winter, 555 U.S. at 22). While Plaintiff being denied admission into ACP solely because of his gender would certainly constitute a serious harm, at this point that harm is speculative. See Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 675 (9th Cir. 1988) (where "multiple contingencies" must occur before the alleged injury occurred, the threat of

---

[7] Because Plaintiff has proven he is likely to succeed on the merits, and Defendants have not produced any concrete or substantial evidence that supports their contention that allowing men to apply to the ACP would be detrimental to the public interest, ECF No. 15 at 24, the public interest and balancing of hardships factors weigh in Plaintiff's favor.

liability was only potential, and therefore too speculative to constitute an "an irreparable harm justifying injunctive relief"). Given the discretionary nature of admittance into the ACP, Plaintiff has not shown that injunctive relief will result in him being accepted into the program. See Cal. Penal Code 1170.05(i)(2) ("The secretary or his or her designee shall have the sole discretion concerning whether to permit program participation as an alternative to custody in state prison."). Without more concrete information regarding the admission process, the harms Plaintiff claims he will suffer are only possible, not likely.

Indeed, all of Plaintiff's purported harms arise out of opportunities missed because he will not be accepted into the ACP. For example, he desires to participate in the ACP to reunite with his minor daughters and return to his caregiving responsibilities, as well as provide for his daughters' financial well-being. ECF No. 5-1 at 21. Plaintiff contends the current separation from his children is painful and he will continue to suffer real emotional and psychological harms by further depriving access to his children if he is not allowed to participate in the ACP. Id. Plaintiff also wishes to return home to provide care for his ailing mother. ECF No. 21 at 20. These are real concerns, but because acceptance into the ACP is discretionary, it is not clear that the injunction Plaintiff seeks will address these "injuries." Stated another way, it appears the only imminent harm to Plaintiff is the loss of the opportunity to apply to the program. However, Plaintiff cites no authority standing for the proposition that the loss of an opportunity to apply to a program is an irreparable harm.

Moreover, Plaintiff's own delay in bringing this action undermines his argument that he is likely to suffer imminent irreparable injury. The Ninth Circuit has held that a plaintiff's delay in seeking a preliminary injunction "implies a lack of urgency and irreparable harm." Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1377 (9th Cir. 1985). This is because a preliminary injunction is based upon the theory of an "urgent need for speedy action" and in "sleeping on its rights a plaintiff demonstrates the lack of need for speedy action." Lydo Enterprises, Inc. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984) (quoting Gillette Co. v. Ed Pinaud, Inc., 178 F. Supp. 618,

622 (S.D. N.Y.1959)).  Plaintiff originally applied for admittance into the ACP on June 3, 2013.  Two weeks later he was told he could not participate because he was male.  Thereafter, Plaintiff made a first, second and third-level appeal of his denial.  Plaintiff's third-level appeal was denied on December 17, 2013, and exhausted his administrative remedies.  Plaintiff did not file this action and seek injunctive relief until July 16, 2014.  ECF No. 1 at 6.  If Plaintiff would have initiated this action with haste after receiving denial of his third-level appeal in December 2013, it is likely the court could have made a determination on the merits, and there would be no need for the Plaintiff to seek the drastic remedy of a preliminary injunction.

Finally, the only case law Plaintiff cites to support his claim of irreparable harm is Brodheim v. Veal, CIV S-06-2326, 2010 WL 4878816 (E.D. Cal. Nov. 17, 2010), a case in which the court held that <u>unlawful</u> incarceration constitutes irreparable injury.   This case is inapposite because Plaintiff is <u>lawfully</u> incarcerated.  ECF No. 5-1 at 22.  Given the higher burden applicable to requests for mandatory injunctive relief, Plaintiff has not shown the requisite likelihood of imminent injury, and his Motion is DENIED.

## CONCLUSION

For the reasons just stated, IT IS HEREBY ORDERED THAT:
1. Plaintiff's Motion for Preliminary Injunction (ECF No. 5) is DENIED;
2. Plaintiff's Objections and Request to Strike (ECF No. 22) is DENIED without prejudice;
3. Defendants' Motion to Strike (ECF No. 25) is DENIED without prejudice;
4. Plaintiff's Motion for Reconsideration (ECF No. 35) is DENIED in part;

///
///
///
///

5. Plaintiff's Motion to Shorten Time (ECF No. 36) is GRANTED. Not later than Thursday, October 16, 2014, the Government is required to respond to Plaintiff's request for an accelerated discovery and summary judgment schedule. Any Reply must be filed not later than 9:00 a.m. on Monday, October 20, 2014;

6. In the meantime, scheduling deadlines are set as follows:

   a. Discovery
      i. All discovery, with the exception of expert discovery, shall be completed by November 28, 2014;
      ii. All expert discovery shall be completed by December 31, 2014;
   b. Motions for Summary Judgment
      i. Any Motion for Summary Judgment shall be filed not later than January 30, 2015;
      ii. Oppositions shall be filed not later than February 20, 2015;
      iii. Replies shall be filed not later than March 5, 2015; and
      iv. The Motion for Summary Judgment Hearing is set on Thursday, March 19, 2015, at 2:00 p.m.

IT IS SO ORDERED.

Dated: October 14, 2014

_____
MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT