UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM SASSMAN,<br><br>                    Plaintiff,<br><br>          v.<br><br>EDMUND G. BROWN, JR., Governor<br>of California, and JEFFREY A. BEARD,<br>Secretary of the California Department<br>of Corrections and Rehabilitation, in<br>their official capacities, and DOES 1-<br>10,<br><br>                    Defendants. | No.  2:14-cv-01679-MCE-KJN<br><br>**MEMORANDUM AND ORDER** |

Plaintiff William Sassman ("Plaintiff") initiated this action against Edmund G.

Brown, Jr., Governor of California, and Jeffrey A. Beard, Secretary of the California

Department of Corrections and Rehabilitation ("CDCR"), in their official capacities

(collectively "Defendants").  Plaintiff claims Defendants' exclusion of men from

California's Alternative Custody Program ("ACP"), as authorized by California Penal

Code section 1170.05, violates the Equal Protection Clause of the Fourteenth

Amendment to the United States Constitution.  Presently before the Court are the

parties' cross-motions for summary judgment and motions to exclude expert reports and

testimony.  ECF Nos. 50-51, 56, 60.  For the following reasons, Defendants' Motion for

1  Summary Judgment and the evidentiary motions are DENIED, and Plaintiff's Motion for

2  Summary Judgment is GRANTED.[1]

3

4                                    **BACKGROUND**

5

6         Senate Bill No. 1266, which added California Penal Code section 1170.05, was

7  signed into law on September 30, 2010.  2010 Cal. Stat., c. 644 ("SB 1266").  That bill

8  provided for the implementation of the ACP, authorizing the CDCR to "offer a program

9  under which female inmates, pregnant inmates, or inmates who, immediately prior to

10 incarceration, were primary caregivers of dependent children . . . who have been

11 committed to state prison may be allowed to participate in a voluntary alternative custody

12 program . . . in lieu of confinement in state prison."  SB 1266 § 2.[2]  More specifically, the

13 ACP permits participants to be released from prison to live in a residential home,

14 transitional care facility, or residential drug treatment program for up to the last twenty-

15 four months of their prison sentences.  Cal. Code Regs. tit. 15 §§ 3078.1(b), 3078.2(b).

16 Each ACP participant is monitored by a CDCR agent and is also subject to electronic

17 monitoring and searches.  Id. § 3078.5.

18        As originally drafted, the ACP would have been open to all female prisoners, but

19 only to males who were "primary caregivers" of dependent children.  SB 1266 § 2(c).

20 Legislative findings underlying the new law were as follows:

21              The incarceration rate for female offenders has doubled over
22              the last 20 years.  As a result, California now has about
                10,000 incarcerated women, which is more than any other
23              state.

24 _____

         [1] Because oral argument would not have been of material assistance, the Court ordered this
25 matter submitted on the briefs.  E.D. Cal. Local R. 230(g).

26        [2] An individual must also meet the following gender-neutral criteria, among others, to be eligible to
   participate in the ACP:  the person cannot have a current conviction for a violent or serious felony, the
27 person cannot have a current or prior conviction for an offense that requires them to register as a sex
   offender, the person must be screened and determined not to pose a high risk to commit a violent offense,
   and the person cannot have a history, within the last ten years, of escape from juvenile or adult custody.
28 Cal. Penal Code § 1170.05(d); Cal. Code Regs. tit. 15, §§ 3078.2, 3078.3.

                                           2

Nearly 70 percent of female inmates are nonviolent offenders. Two-thirds of female inmates were convicted of property or drug-related crimes.

While over half of the men in prison were incarcerated for violent crimes, only 30 percent of women were convicted of violence.

Female inmates are more likely to be victims of violent crimes than to be the perpetrators. Four in 10 female inmates were physically or sexually abused before 18 years of age.

Over two-thirds of women are classified as low risk by the prison classification system. However, women are often held in more secure environments than their custody classifications would warrant.

Approximately 67 percent of incarcerated women are mothers, and many of them are single parents. Most of California's incarcerated mothers are the primary caregivers of dependent children and hope to return home to their children. While the vast majority of children of incarcerated men continue to live with their mothers, children of incarcerated women are more likely to end up living with other relatives or in foster care.

<u>Separating parents from children has a substantial impact on their futures. Children of inmates are much more likely than their peers to become incarcerated.</u> Research suggests that mothers who are able to maintain a relationship with their children are less likely to return to prison. <u>Research also demonstrates that a father's involvement in his child's life greatly improves the child's chances for success. Helping incarcerated fathers foster stronger connections with their children, where appropriate, can have positive effects for children. Strong family connections help to ensure that fathers stay out of prison once they are released.</u>

<u>To break the cycle of incarceration, California must adopt policies that facilitate parenting and family reunification.</u>

SB 1266 § 1 (lettering removed) (emphasis added).[3]

---

[3] Additional excerpts from the legislative history also indicate that the Legislature had men in mind when it enacted the ACP. <u>See, e.g.</u>, SB 1266 § 2 ("Willful failure of the program participant to return to the place of detention not later than the expiration of any period of time during which <u>he or she is authorized</u> to be away from the place of detention pursuant to this section, unauthorized departures from the place of detention, or tampering with or disabling, or attempting to tamper with or disable, an electronic monitoring device shall subject the participant to a return to custody . . . .") (emphasis added); <u>id.</u> ("The participant shall remain within the interior premises of <u>his or her residence</u> during the hours designated by the secretary or his or her designee.") (emphasis added); <u>id.</u> ("In addition, the participant shall admit any peace officer designated by the secretary or his or her designee into the participant's residence at any time for purposes of verifying the participant's compliance with the conditions of <u>his or her detention.</u>")

1    A March 2013 CDCR Fact Sheet also indicated that the purpose of the ACP is "reuniting

2    low-level inmates with their families and reintegrating them back into their community."

3    Decl. of Van Swearingen ("Swearingen Decl."), ECF No. 50-4, Ex. F, at 1.  In addition,

4    the Senate Committee on Public Safety made clear that "[t]he aim of [the ACP] [is] to

5    lower recidivism rates, encourage community and family involvement, hold fewer

6    children in Child Welfare System, and reduce the likelihood that an inmate's children will

7    embark on a life of crime."  D'Agostino Decl., ECF No. 18-6, Ex. F, at 11.

8         Defendants contend, however, that the purpose of the ACP is more specific—

9    namely, to implement a gender-responsive program to "address women's unique

10   pathways to criminality, and thereby, reduce recidivism."  Defs.' Mot. Summ. J. ("Defs.'

11   Mot."), ECF No. 51, at 1.  According to Defendants' retained expert, Dr. Nena Messina,[4]

12   "women offenders have been receiving services and programs developed primarily for

13   their male counterparts."  Messina Expert Report ("Messina Report"), ECF No. 48-1, at

14   4.  However, "[a] large body of consistent and replicated literature has shown that

15   women offenders are low risk to public safety with complex needs that are better met in

16   community settings."  Id. at 5.  As Dr. Messina explains: "Female crime rates, with few

17   exceptions, are much lower than male crime rates," and "[w]omen's participation [in

18   violent crime] is profoundly lower."  Messina Report at 6.  In support of her conclusions,

19   Dr. Messina provides a number of other opinions with regard to the backgrounds and

20   needs of female inmates.

21        For example, according to Dr. Messina, "[i]ncarcerated women are . . . more likely

22   than incarcerated men to report extensive histories of trauma, including emotional,

23   physical, and sexual abuse as children, adolescents, and adults."  Id. at 3 (internal

24   citations omitted).  "[W]omen report a higher degree of trauma and a higher impact of

25   (emphasis added); id. ("The secretary or his or her designee may immediately retake the participant into
     custody to serve the balance of his or her sentence . . . .") (emphasis added).

26

27       [4] Plaintiff moves to strike Dr. Messina's testimony.  ECF No. 60.  Because the Court finds in favor
     of Plaintiff even after considering that testimony, Plaintiff's Motion is DENIED as moot.  Similarly, because
     the Court did not rely on Plaintiff's expert in reaching its decisions, Defendants' Motion to Exclude Expert
28   Report and Testimony (ECF No. 56) is DENIED as well.

1   that trauma on their current posttraumatic stress disorder compared to . . . men."

2   D'Agostino Decl., Ex. B ("Messina Dep."), ECF 52-2, 144:15-18.  "Although a male

3   inmate can have all these problems, he is less likely to, and the problems tend to have a

4   differential impact on women: women who experience childhood abuse and trauma

5   become involved with crime significantly earlier than boys with similar histories, and girls

6   without such histories."  Defs.' Mot. at 4-5 (citing Messina Report at 5-6).  In sum,

7   according to Dr. Messina, women "are more likely to be dysfunctional" as a result of

8   childhood abuse, mental illness, and poverty.  Messina Dep. at 176:8-177:4.

9       Dr. Messina also avers that "[w]omen are less likely to be employed before or

10  after incarceration, and are more likely to have primary caregiver responsibilities

11  compared to men in all states."  Defs.' Mot. at 5 (citing Messina Dep. at 71:2-7;

12  D'Agostino Decl., Ex. A ("Messina Rebuttal"), ECF No. 52-1, at 1).  "Reuniting with

13  children has been shown to reduce the risk of recidivism for women, but not for men."

14  Id. (citing Messina Report at 10; Messina Dep. at 24:5-11).  She also indicates that there

15  is purportedly a "very low likelihood that men will be primary caregivers of children and

16  reunify with their children when they leave prison."  Id. (citing Messina Dep. at 113:10-

17  114:12).

18      Dr. Messina thus opines that, "[a]lthough family reunification is a strong predictor

19  of success for female offenders, the same is not necessarily true for men: research

20  demonstrates that primary predictors of criminal behavior for men include criminally

21  active peers, extensive prior offending, and financial gain."  Id. (citing Messina Dep. at

22  127:18-128: 7; Messina Report at 6).  Similarly, according to Dr. Messina, "research

23  shows that men of the same risk profiles as ACP-eligible women are still more likely to

24  recidivate," and unlike men, "factors associated with women's post-release success are

25  residing with children, strong family support, self-help participation, and specialized

26  programs with services for women and children."  Id. (citing Messina Dep. at 85:4-6,

27  86:2-88:2; Messina Report at 3).  Finally, Dr. Messina testifies that "[w]omen have

28  multiple social service needs that are not well met in prison."  Id. at 5-6 (citing Messina

1   Dep. at 25:1-10).  She thus concludes that a "[g]ender-responsive policy and practice

2   target women's pathways to criminality by providing effective interventions that address

3   the intersecting issues of trauma, criminal behavior, substance abuse, mental health and

4   economic marginality, as well as specific services" is needed.   Messina Report at 5.

5        Regardless of the Legislature's precise intent, CDCR formally launched the ACP

6   on September 12, 2011.  See Swearingen Decl., Ex. C.  At that time it was decided that,

7   "[i]nitially, the program [would] be offered to qualifying female inmates.  Participation may

8   be offered at a later date to male inmates, at the discretion of the Secretary of CDCR."

9   Id.

10        However, on June 27, 2012, Governor Brown signed Senate Bill No. 1021, which

11   modified section 1170.05 to read: "[F]emale inmates sentenced to state prison for a

12   determinate term of imprisonment pursuant to Section 1170, and only those persons,

13   shall be eligible to participate in the alternative custody program authorized by this

14   section."  Cal. Penal Code § 1170.05(c) (emphasis added).  Shortly thereafter, on

15   September 13, 2012, CDCR issued a notice of approval of emergency regulatory action

16   providing that "[t]o be eligible to participate in the Alternative Custody Program (ACP),

17   the inmate must volunteer and be female."  Cal. Code Regs. tit. 15 § 3078.2(a).[5]

18        Given the ACP's difference in treatment of male and female inmates, CDCR

19   received a number of comments questioning whether the program impermissibly

20   discriminates against men.  See Swearingen Decl., Ex. E.  Most significantly, the

21   California Office of the Legislative Counsel issued statements warning the author of the

22   bill and the Governor that "[i]n so far as this bill would create a program that provides for

23   early release of women from prison custody to less restrictive confinement based on

24   gender, the bill may be construed as violating the constitutional requirement of equal

25   protection of law."  Id., Ex. M.  The regulations nonetheless became effective and limited

26   ACP eligibility to female applicants.  Cal. Code Regs. tit. 15, § 3078.2.

27   _____

28        [5] This was the only relevant change in the eligibility criteria; none of the gender-neutral
     exclusionary criteria were changed.

6

1    Even for female inmates otherwise satisfying the eligibility requirements, however,

2    acceptance into the ACP is not guaranteed.  The CDCR screens ACP applicants to

3    evaluate whether a prisoner may participate in the Program.  Cal. Code Regs. tit. 15

4    § 3078.4.  A prisoner's predictive risk is assessed, and the CDCR prepares

5    Individualized Treatment and Rehabilitation Plans ("ITRP") for each participant.  Id.  The

6    goal in preparing the ITRP is to address the specific needs of each participant, with

7    various factors being considered, including: "(A) Housing; (B) Employment plans;

8    (C) Transportation; (D) Substance abuse treatment; (E) Parenting and life skills;

9    (F) Anger management and criminal thinking; (G) Career Technical Education programs

10   and educational needs; (H) Social services needs, e.g., Veteran's Affairs benefits,

11   general assistance, social security; [and] (I) Medical, dental, and mental health needs."

12   Id.  The ITRPs themselves include goals such as:  "receive [substance abuse]

13   treatment," "obtain counseling," "seek and complete vocational training," and "seek

14   employment."  Swearingen Decl., Ex. Q.  The ITRP is presented to an Institutional

15   Classification Committee, who considers the inmate for placement in the ACP.  Cal.

16   Code Regs. tit. 15 § 3078.4.

17   Inmates chosen to participate in the ACP are supervised by a parole officer, who

18   also acts as a case manager.  Id., § 3078.5.  "A key component of the ACP . . . is

19   mandatory case management services," including at least one at-home inmate contact

20   per month.  Decl. of Jill Brown ("Brown Decl."), ECF No. 53, Ex. A, at 51, 71-72.

21   Participating inmates are expected to comply with ITRP expectations and any special

22   requirements set by the parole-agent/case-manager.  Id. at 49, 71-72.  As inmates

23   progress through their plans, the case manager identifies further objectives.  Id. at 50.

24   The CDCR also generates "Case Plans," which identify "goals, task and activities"

25   for ACP participants.  Swearingen Decl., Ex. P.  Those Case Plans direct that

26   participants should, for example, "address mental health needs," "stay clean and sober,"

27   "obtain an ID," "develop job skills," and "secure an income."  Id.  The Plans also identify

28   ///

1    programs and services available to ACP participants in their home communities,

2    programs and services that are generally available to both genders.  Id.

3         As indicated above, ACP participants may apply to serve their sentences in

4    private homes, in private drug-treatment or transitional care facilities, or in a Female

5    Offender Treatment and Employment Program ("FOTEP").  Cal. Penal Code § 1170.05;

6    Messina Report at 4.  Those offenders finishing out their sentences in their homes are

7    still expected to "be involved in programs, services and/or employment."  Brown Decl.,

8    Ex. A, at 52.  The Case manager refers inmates living in private homes to services and

9    programs and monitors the inmate's progress.  Id. at 51-52, 71.  Those participants

10   released to drug-treatment or transitional care facilities should, depending on the facility,

11   also have access to "gender-responsive specific groups and specific curricula for

12   women."  Messina Dep. at 24:12-21.

13        On June 3, 2013, Plaintiff applied to the ACP, requesting that he be allowed to

14   finish his sentence in his home community of Sacramento.  Decl. of William Sassman

15   Decl. ("Sassman Decl."), ECF No. 50-7, ¶ 8, Ex. A.  Plaintiff contends that, exclusive of

16   his gender, he met and still meets all of the criteria required to be eligible to apply to the

17   ACP.  Id. ¶ 7.  On June 19, 2013, however, a CDCR correctional counselor denied

18   Plaintiff's application solely because he was male.  Id. ¶ 8, Ex. A.  Plaintiff appealed the

19   denial of his ACP application through the third-level of review, and the CDCR denied the

20   last appeal in December 2013.  Id. ¶¶ 9-14, Exs. B-E.  His appeal was ultimately rejected

21   because "[s]tate law only allows female inmates to participate in the ACP."  Id. at Ex. E.

22   According to Defendants, male inmates may transition back into society via existing

23   transition hubs instead.  Defs.' Mot. at 8 (citing

24   http://www.cdcr.ca.gov/rehabilitation/reentry-hubs.html).  Programs on substance abuse,

25   criminal thinking, anger management, and family relationships are offered" in these

26   hubs, and inmates may "obtain ID cards, academic degrees, and trade certifications."  Id.

27   Similar services are offered to parolees at Residential Multi-Service Centers.  Id. at 9

28   (citing http://www.cdcr.ca.gov/rehabilitation/ residential-multi-service-center.html).

1    In the meantime, as of October 2014, 422 women have participated in the ACP,

2    and there are currently 69 participants.  Brown Decl. ¶ 3.  "In 2014, the ACP had

3    received 1,058 applications," but, "of those, only 118 inmates were accepted into the

4    program."  Decl. of Robin Harrington, ECF No. 65, ¶ 3.  Of the approximately 117,805

5    male inmates in the California prison system, an estimated 3,149 male inmates could

6    potentially be eligible for the ACP and that 500 men could probably be admitted.

7    Swearingen Decl., ¶¶ 8-9, 22, Exs. G, H, U.

8    Upon denial of his appeal, on July 16, 2014, Plaintiff filed the instant action

9    challenging the exclusion from men from the ACP (ECF No. 1) and a motion for

10   preliminary injunctive relief (ECF No. 5).  After considering Plaintiff's request for

11   injunctive relief, the Court determined that Plaintiff had shown he was likely to succeed

12   on the merits of his claims but denied his request due to Plaintiff's failure to show the

13   requisite likelihood of irreparable harm.[6]  ECF No. 38.  The Court set a shortened

14   discovery and briefing schedule for the parties' Cross Motions for Summary Judgment,

15   which are presently before the Court.  Id.

16

17                                    **STANDARD**

18

19   The Federal Rules of Civil Procedure[7] provide for summary judgment when "the

20   movant shows that there is no genuine dispute as to any material fact and the movant is

21   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

22   477 U.S. 317, 322 (1986).  "A party asserting that a fact cannot be or is genuinely

23   disputed must support the assertion by: (A) citing to particular parts of materials in the

24   record, including depositions, documents, electronically stored information, affidavits or

25   declarations, stipulations (including those made for purposes of the motion only),

26   ────────────────────
          [6] The Court also denied Plaintiff's subsequent Motion for Reconsideration (ECF No. 35) to the
27   extent it asked the Court to reconsider its decision on the merits.  ECF No. 38.

28       [7] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless
     otherwise noted.

                                          9

admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 323-24.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); see also State of Cal., on Behalf of Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir.1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying" the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavit or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."  Id. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)).  As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Id. at 587 (quoting Cities Service, 391 U.S.at 289).

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir.1987).

**ANALYSIS**

Plaintiff contends that California's refusal to permit male inmates to apply to the ACP violates the Equal Protection Clause of the Fourteenth Amendment.  In response,

1    Defendants counter that the ACP was properly enacted to provide gender responsive

2    programming only to women, who are an underserved subset of California's prison

3    population.  The Court is confident that the California Legislature acted with the best of

4    intentions in establishing the ACP.  However, by insisting that this is just a programming

5    case, Defendants utterly fail to acknowledge Plaintiff's primary point.  This case is not

6    about programming.  It is about freedom from incarceration.  The line the State has

7    drawn separates male offenders, who must remain inside of prison walls, from female

8    offenders, who may apply to serve the last two years of their sentences in the

9    community.  The result is that ACP-eligible male inmates must by definition serve two

10   additional years in a penal institution than they would potentially have to serve if they

11   were female.  And families of ACP-eligible male offenders must wait two additional years

12   to start their reunification process than families of ACP-eligible females.

13       When the State draws a line between two classes of persons, and denies one of

14   those classes a right as fundamental as physical freedom, that action survives equal

15   protection review only if the State has a sufficient justification for the classification.  Here,

16   the State does not.

17       **A.    Prohibiting male inmates from applying to the ACP is**
            **unconstitutional.**
18

19       The Equal Protection Clause "commands that no state shall 'deny to any person

20   within its jurisdiction the equal protection of the laws,' which is essentially a direction that

21   all persons similarly situated should be treated alike."  City of Cleburne, Tex. v. Cleburne

22   Living Ctr., 473 U.S. 432, 439 (1985) (citing Pyler v. Doe, 457 U.S. 202, 216 (1982)).[8]

23   State policies that expressly discriminate among applicants on the basis of gender are

24   "subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment."

25   Miss. Univ. for Women v. Hogan, 458 U.S. 718, 723 (1982).  Just because a statutory

26

27       [8] The Court has already determined that those male and female inmates who meet the gender-
         neutral criteria set forth in the ACP are similarly situated.  ECF No. 38.  Nothing presented since the
         Court's October 14, 2014, Order convinces the Court otherwise.
28

policy "discriminates against males rather than against females does not exempt it from scrutiny or reduce the standard of review."  Id.

"[T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification."  Id. at 724 (quoting Kirchberg v. Feenstra, 450 U.S. 455, 461 (1981)).  "The burden is met only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'"  Id. (quoting Wengler v. Druggists Mutual Ins. Co., 446 U.S. 142, 150 (1980)).[9]  This test "must be applied free of fixed notions concerning the roles and abilities of males and females.  Care must be taken in ascertaining whether the statutory objective itself reflects archaic and stereotypic notions."  Id. at 724-25.

If a court finds that a State's objective is legitimate and important, the next step is to determine whether the discriminatory means are substantially related to the important governmental interest.  Id.  "The purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than

_____

[9] The Court declines Defendants' invitation to apply the less-stringent standard of review set forth in Turner v. Safley, 482 U.S. 78, 89 (1987).  Under Turner, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Id. This Court has already rejected Defendants' argument.  See, generally, ECF No. 38.  The Turner standard is more appropriate to claims going to prison administration, not to Plaintiff's claims regarding prisoner release.  Plaintiff's challenge does not concern "institutional operations" or the "closed environment of the correctional institution."  See Turner, 482 U.S. at 89-90.  Rather, the crux of his complaint is that California has selectively allowed only women to leave that closed environment.  This case is thus more akin to Johnson v. California, where the Court stated that "[t]he right not to be discriminated against based on one's race is not susceptible to the logic of Turner.  It is not a right that need necessarily be compromised for the sake of proper prison administration."  543 U.S. 499, 510 (2005).  Accordingly, "[i]n the absence of controlling caselaw, the [C]ourt is compelled to find that the right to be free of gender discrimination is a 'right that need [not] necessarily be compromised'" here as well.  Greene v. Tilton, No. 2:09-cv-00793-JAM-JFM, 2012 WL 691704, at *8 (E.D. Cal. Mar. 2, 2012), recommendation adopted by 2012 WL 1130602 (E.D. Cal. Mar. 29, 2012) (quoting Johnson, 543 U.S. at 510).  Regardless, even if the Court were to apply the less stringent Turner standard, Defendants' exclusion of men from the ACP would still fail for the reasons set forth in this Memorandum and Order because the State cannot show even a "valid, rational connection" between the exclusion of men from the ACP and its purported objectives, there appears to be no other avenue for male inmates to obtain early release, the State does not assert that the allocation of prison resources will be detrimentally impacted by releasing men or that guards or other inmates will be adversely affected, and there is an obvious, easy alternative to the discriminatory option, which is simply to let men apply to the ACP as well.  See Turner, 482 U.S. at 89-91.

1  through the mechanical application of traditional, often inaccurate, assumptions about

2  the proper roles of men and women."  Id. at 725-26.

3      According to Plaintiff, he is entitled to judgment as a matter of law because he is

4  similarly situated to female inmates that are eligible for the ACP, and the program's

5  exclusion of men serves no important governmental objective.  Pl.'s Mot. for Summ. J.

6  ("Pl.'s Mot."), ECF No. 50-1.  Defendants contend, however, that the ACP survives

7  constitutional scrutiny because it:  "(1) serves the legitimate governmental objective of

8  reducing recidivism for female offenders and ameliorating the disproportionate burdens

9  they face in prison, particularly by treating the lasting effects of separation from their

10  children, and trauma, abuse, and addiction; and (2) is substantially related to that

11  objective because it provides gender-responsive programming tailored to female

12  offenders' needs."  Defs.' Mot. at 2.  Defendants' arguments prove too much.[10]

13      As a threshold matter, there is no reason for the State to rely on gender as a

14  proxy for need because the ACP already provides a highly individualized process to

15  determine individual inmate qualifications.  In any event, the State has not shown that

16  gender is an accurate proxy here.  Indeed, this case bears no similarity to those cases in

17  which gender distinctions have been upheld.  Moreover, the State has offered no

18  persuasive explanation as to how excluding male offenders from the ACP furthers any of

19  its objectives.  Finally, the ACP's gender distinction fails for fundamental policy reasons

20

21      [10] The legislative history made clear that, contrary to Defendants' current assertions, the State's interests in passing the ACP were family reunification and community reintegration, which this Court has already determined are interests not served, and indeed undermined, by excluding men from the ACP. ECF No. 38 at 12-13.  That analysis is incorporated by reference in its entirety here.  Id.  In addition, the

22  Court previously determined that the State's contention that the important governmental objectives behind

23  the ACP were "strengthening the bond between incarcerated women and their children and addressing the holistic needs of incarcerated women . . . .'" was "not borne out by the record."  Id. at 12 (citing ECF No. 15

24  at 15).  More specifically, the Court found these to be "post hoc" explanations that contradicted the express intent of the Legislature.  Id.  The arguments Defendants currently make are remarkably similar to

25  those previously presented to the Court in late 2014.  Despite the fact that the Court still doubts whether Defendants' currently articulated objectives are anything other than post hoc attempts to justify an

26  irrational classification, the Court will nonetheless address those interests, which are no doubt important, here.  See Weinberger v. Wiesenfeld, 420 U.S. 636, 648 n.16 (1975) ("This Court need not in equal

27  protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of

28  the legislation.").

1  as well.  Accordingly, the refusal to permit male inmates to apply to the ACP is not

2  substantially related to any governmental interest, and the arbitrary line the State has

3  created between male and female inmates cannot stand.

**1.  Sex is an unnecessary proxy for need given the ACP's highly individualized application and case management system.**

6  The Court could conclude that the ACP fails to pass constitutional muster under

7  the case of Orr v. Orr alone.  440 U.S. 268 (1979).  In Orr, the Court considered "the

8  constitutionality of [state] alimony statutes which provide[d] that husbands, but not wives,

9  may be required to pay alimony upon divorce."  Id. at 270.  Several objectives potentially

10  motivated the Legislature to make that distinction.  For example, the statutes could have

11  been "designed for the wife of a broken marriage who need[ed] financial assistance,"

12  which raised the possibility of two legislative objectives:  "One [was] a legislative purpose

13  to provide help for needy spouses, using sex as a proxy for need.  The other [was] a

14  goal of compensating women for past discrimination during marriage, which assertedly

15  ha[d] left them unprepared to fend for themselves in the working world following divorce."

16  Id. at 280.  The Court reasoned, of course, that "assisting needy spouses is a legitimate

17  and important governmental objective," as is "'[r]eduction of the disparity in economic

18  condition between men and women caused by the long history of discrimination against

19  women.'"  Id. (quoting Califano v. Webster, 430 U.S. 313, 317 (1977)).  Nonetheless, the

20  problem presented in Orr, like that confronted by the Court here, was that the

21  classification did not "substantially relate[] to achievement of those objectives."  Id.

22  (internal citations and quotations marks omitted).

23  More specifically, the alimony statutes scrutinized in Orr already contemplated

24  "individualized hearings at which the parties' relative financial circumstances [were]

25  considered."  Id. at 281.  "There [was] no reason, therefore, to use sex as a proxy for

26  need."  Id.  To the contrary, "[n]eedy males could be helped along with needy females

27  with little if any additional burden on the State."  Id.  "'Thus, the gender-based distinction

28  [was] gratuitous; without it, the statutory scheme would only provide benefits to those

1   men who [were] in fact similarly situated to the women the statute aids,' . . . and the

2   effort to help those women would not in any way be compromised." Id. (quoting

3   Weinberger, 420 U.S. at 653).

4       Exactly the same considerations apply here.  Each individual applicant's eligibility

5   for the ACP and her programming needs are determined on a case-by-case basis when

6   she seeks admission to the Program.  Since Defendants already look to the merits of

7   each application to determine whether an individual may benefit from participation, there

8   is no reason that applications from both males and females could not be reviewed.

9   Accordingly, in this case as in Orr, "males could be helped along with . . . females."

10       The importance of individualized inquiries can also be garnered from another

11   analogous case, Caban v. Mohammed, 441 U.S. 380 (1979), in which the Supreme

12   Court simultaneously emphasized the importance of both maternal and paternal

13   relationships.  Caban involved a challenge to a state law that distinguished between

14   unwed mothers and unwed fathers with regard to their adoption rights.  Id. at 381-82.

15   The New York adoption law at issue provided that consent to the adoption of minor

16   children had to be given by the parents of children born in wedlock or the mothers of

17   children born out of wedlock.  Id. at 385.  That is, in most circumstances, "an unwed

18   mother ha[d] the authority to block the adoption of her child simply by withholding

19   consent," but "[t]he unwed father ha[d] no similar control over the fate of his child, even

20   when his parental relationship [was] substantial," which was the case before the Court

21   there.  Id. at 386-87.  Instead, an unwed father was able to "prevent the termination of

22   his parental rights only by showing that the best interests of the child would not permit

23   the child's adoption by the petitioning couple."  Id. at 387.

24       The appellees contended in Caban that "the distinction [was] justified by a

25   fundamental difference between maternal and paternal relations – that a natural mother,

26   absent special circumstances, bears a closer relationship with her child . . . than a father

27   does."  Id. at 388 (internal citations and quotations omitted).  That rationale is markedly

28   similar to California's justifications for a female only ACP in this case—that incarcerated

1  fathers are less likely to reunify with children than incarcerated mothers.  The Supreme

2  Court rejected that argument for the obvious reason that "maternal and paternal roles

3  are not invariably different in importance."  Id. at 389.

4  　　　The Court finds Caban especially on point because the adoption scheme

5  challenged there, like the statute in Orr, also provided for individualized hearings.

6  Indeed, the Caban parties were even represented by counsel during the adoption

7  proceedings before a hearing officer.  Id. at 383.  The fact that the parties had access to

8  hearings to present their cases as to the merits of an adoption petition seriously

9  undermined any need the State might offer for imposing a bright-line gender distinction.

10  Here too, the fact that the ACP is designed specifically to be an individualized program

11  that by definition determines both inmate qualifications and programming needs

12  undermines the State's decision to use gender as a proxy as well.

13

14  　　　　　2.　　Even if the State needed to use gender as a proxy for need, its
　　　　　　　　　　evidence supporting the distinction is insufficient.

15  　　　　　　　a.　　The State impermissibly relies on overly-broad
16  　　　　　　　　　　generalizations regarding the differences between men
　　　　　　　　　　　and women.

17  　　　In attempting to nonetheless justify its bright gender line, the State primarily relies

18  on the report and testimony of its expert, Dr. Messina, in arguing that:  (1) "[A] large body

19  of research and literature shows that female offenders are a low risk to public safety with

20  complex needs that are better met in the community"; (2) "[I]ncarcerated women are

21  more likely than incarcerated men to report extensive histories of trauma, including

22  emotional, physical, and sexual abuse as children, adolescents, and adults";

23  (3) "[F]emale offenders report a higher degree of trauma and a higher impact of that

24  trauma when compared to men"; (4) "Although a male inmate can have all these

25  problems, he is less likely to, and these problems tend to have a differential impact on

26  women"; (5) "[W]omen are more likely to be dysfunctional as a result of childhood abuse,

27  mental illness, and poverty"; (6) "Women are less likely to be employed before or after

28  incarceration, and are more likely to have primary caregiver responsibilities compared to

1  men in all states"; (7) "[R]euniting with children has been shown to <u>reduce the risk</u> of

2  recidivism for women, but not for men"; (8) "[T]he legislature found that women are far

3  <u>less violent</u> than male offenders; (9) "[W]omen's participation in violent crime is

4  "<u>profoundly lower</u>" than men's"; (10) "There is . . . a very <u>low likelihood</u> that men will be

5  primary caregivers of children and will reunify with their children when they leave prison";

6  and (11) "Although family reunification is a <u>strong predictor</u> of success for female

7  offenders, the same is <u>not necessarily true</u> for men."  Defs.' Mot. at 4-5 (internal citations

8  and quotation marks omitted) (emphasis added).  Cataloguing these arguments in this

9  way makes it glaringly obvious that the State impermissibly relies solely on "likelihoods"

10 and "tendencies" to support its legislation.  In this regard, the instant case is similar to

11 <u>United States v. Virginia</u>, 518 U.S. 515 (1996).

12         In <u>Virginia</u>, female applicants sued the Commonwealth and its Virginia Military

13 Institute ("VMI") arguing that VMI's "exclusively male admissions policy violated the

14 Equal Protection Clause."  <u>Id.</u> at 523.  Expert witness testimony indicated, however, that

15 "coeducation would materially affect at least . . . three aspects of VMI's program –

16 physical training, the absence of privacy, and the adversarial approach."  <u>Id.</u> at 540

17 (internal citations and quotations omitted).  The district court agreed and rejected the

18 plaintiffs' equal protection arguments after making "findings" on "gender-based

19 developmental differences."  <u>Id.</u> at 541 (citations omitted).

20         The Supreme Court reversed, in part because the district court's findings simply

21 "restate[d] the opinions of Virginia's expert witnesses, opinions about typically male or

22 typically female 'tendencies.'"  <u>Id.</u> (citations omitted).  For example, the district court

23 determined that "[m]ales tend to need an atmosphere of adversativeness, while

24 [f]emales tend to thrive in a cooperative atmosphere."  <u>Id.</u> (citation and internal

25 quotations omitted).  Such "[g]eneralizations and tendencies" are subject to a hard look,

26 however, because "[s]tate actors controlling gates to opportunity . . . may not exclude

27 qualified individuals based on 'fixed notions concerning the roles and abilities of males

28 and females.'"  <u>Id.</u> (citations omitted).  This case is no different; given the highly

1   individualized nature of the ACP, there is simply no reason to resort to generalities rather

2   than to review the facts presented by each particular scenario.

3       Moreover, whether such generalized "findings" as to male or female "tendencies"

4   are accurate does not matter.  Id. at 542.  Here, although most men might not qualify for

5   the ACP, a conclusion to that effect nonetheless cannot be drawn by way of sweeping

6   generalization.  Significantly, while the Supreme Court assumed in Virginia that most

7   women would not choose VMI's "adversarial method,"[11] such a determination was

8   nevertheless not a "one size fits all business."  Id.  To the contrary, it was clear in

9   Virginia that "the VMI methodology could be used to educate women."  Id. (internal

10  citations and quotation marks omitted).  "[S]ome women, at least would want to attend

11  [VMI] if they had the opportunity[,] . . . [would be] capable of all of the individual activities

12  required of VMI cadets."  Id. at 550 (internal citations and quotation marks omitted).  "In

13  sum, . . . neither the goal of producing citizen soldiers . . . nor VMI's implementing

14  methodology [was] inherently unsuitable to women."  Id. at 541 (internal citations and

15  quotations omitted).  Ultimately, the issue in Virginia was not "whether 'women–or men–

16  should be forced to attend VMI'; rather, the question [was] whether the Commonwealth

17  can constitutionally deny to women who have the will and capacity, the training and

18  attendant opportunities that VMI uniquely affords."  Id. (internal citations omitted).

19      The State does not deny here that, as in Virginia, some men may qualify and

20  benefit from the ACP.  See Defs.' Mot. at 15 ("Plaintiff has argued that some male

21  inmates could benefit from many of the programs offered under the ACP. Even if true,

22  that is of no moment.").  Indeed, Plaintiff himself has provided evidence demonstrating

23  that he has a significant relationship with his children such that he and his family would

24  benefit from the opportunity to reconnect and work on their relationships sooner rather

25  than later.  The Court has been provided no reason to doubt that Plaintiff will actually

26  reunify with his family or to find that Plaintiff may recidivate even despite being given the

27  _____

28      [11] Nor, as the Supreme Court pointed out, would many men.  Virginia, 518 U.S. at 542.

19

1    opportunity to do so.  Accordingly, as in <u>Virginia</u>, the State's generalizations are

2    insufficient to convince this Court it can deny all those who have the "will and capacity"

3    and would otherwise qualify, "the attendant opportunities that [the ACP] uniquely

4    affords."

5            **b.**     **Even if the State's empirical evidence went beyond**
                 **generalizations, it is inapplicable here because**

6                     **Defendants do not address the correct inmate**
                 **populations.**

7

8         Even if Defendants' statistical evidence was more persuasive, it still fails to

9    support the distinction made regarding the ACP because it focuses on inmate

10   populations as a whole, not those inmates that are ACP-eligible.  Defendants compare

11   all male offenders to all female offenders.  But ACP applicants stand on a different

12   footing from other inmates since they must meet the gender-neutral exclusionary criteria

13   that eliminate most of the population from consideration.[12]

14        For example, to be eligible an applicant must not have sustained a conviction for

15   a violent or serious felony, and must not have been convicted of crimes that would

16   require them to register as a sex offender.  They should also have been screened to

17   determine that they do not pose a high risk of committing a violent offense.  The fact that

18   the ACP application process operates to screen out violent offenders makes any reliance

19   on the violent tendencies of the general prison population nonsensical.  Furthermore,

20   nothing before the Court indicates the other generalizations made about inmate

21   populations are any more applicable to the ACP-eligible subclass.

22        To the contrary, it defies logic to think that the system-wide statistics on which

23   Defendants rely have any correlation to the relatively minute subset of men who may be

24   eligible for the ACP.  Defendants' own evidence indicates that, out of the thousands of

25          [12] The closest the State comes to correcting this error is its argument that "research shows that

26   men of the same risk profiles as ACP-eligible women are still more likely to recidivate."  Defs.' Mot. at 5
(citing Messina Dep. at 85:4-6, 86:2-88:2).  Not only is this statement too broad to support any concrete

27   conclusions, it actually supports permitting male offenders to apply to the ACP.  If the ACP is intended to
reduce recidivism, and men are more likely to recidivate, it follows that men may be in even greater need

28   of ACP programming than women.

male inmates in the California system, only approximately 3,149 are potentially eligible

for the ACP.  Even more striking, only about 500 of that subset would likely be admitted

to the Program.  Defendants offer no evidence that generalizations made with regard to

the entire California prison population are in any way indicative of the characteristics of

the small fraction of inmates who may actually be accepted to the ACP.  See generally

Craig v. Boren, 429 U.S. 190, 199-204 (1976) ("[T]his merely illustrates that proving

broad sociological propositions by statistics is a dubious business, and one that

inevitably is in tension with the normative philosophy that underlies the Equal Protection

Clause.").  Defendants' overly broad empirical evidence simply has no bearing on the

narrow question before the Court.

> **3.** **Statistical problems aside, this case is fundamentally different from those where the Supreme Court has approved using gender as a proxy for need.**

Even if the Defendants' statistical evidence was flawless, the ACP would still fail

constitutional review.  Indeed, Defendants have not identified any case where gender

was permitted to act as a surrogate for need in situations such as this.  To the contrary,

the cases on which Defendants rely are clearly distinguishable.  For example, in

Schlesinger v. Ballard, 419 U.S. 498 (1975), and Rostker v. Goldberg, 453 U.S. 57

(1981), the Court upheld statutory distinctions put in place because all females were

categorically precluded from some types of military service, namely serving in combat

roles.  Those cases were much different from this one because, as a matter of law, no

woman was similarly situated to any man.  Here, there may be many male inmates who

are similarly situated to female inmates, despite the fact that female inmates may

nonetheless be "more likely" to qualify for the ACP.

More specifically, in Schlesinger, the Court rejected a challenge to differing

mandatory discharge rules for male and female naval officers.  Female officers were not

subject to mandatory discharge until being passed over for promotion after thirteen years

of service.  419 U.S. at 505-06.  Male officers, on the other hand, were subject to

mandatory discharge after failing to promote twice and having served less time as a

1   commissioned officer (i.e., nine years).  419 U.S. at 499, 503.  The Court upheld that

2   distinction, explaining that "the different treatment of men and women naval

3   officers . . . reflects, not archaic and overbroad generalizations, but, instead, the

4   demonstrable fact that male and female line officers in the Navy are not similarly situated

5   with respect to opportunities for professional service." Id. at 508.  "Specifically women

6   [could] not be assigned to duty in aircraft that [were] engaged in combat missions nor

7   [could] they be assigned to duty on vessels of the Navy other than hospital ships and

8   transports." Id. (internal citations and quotation marks omitted).  Accordingly,

9   opportunities to acquire service records comparable to men were more limited for

10   women.  Id.  Congress could therefore rationally have concluded that a longer tenure

11   period for female officers would help provide "fair and equitable career advancement

12   programs." Id. (internal citations and quotation marks omitted).  Indeed, this made even

13   more sense when "underscored by the fact that in corps where male and female

14   lieutenants [were] similarly situated, Congress ha[d] not differentiated between them with

15   respect to tenure." Id. at 509.

16          Similarly, in Rostker, the Supreme Court upheld the constitutionality of the

17   President's power to require only males to register under the Military Selective Services

18   Act.  453 U.S. at 59, 83.  The purpose of the registration requirement was to meet the

19   need for combat troops that would characterize any future draft.  Id. at 76.  As in

20   Schlesinger, however, women were categorically ineligible for combat.  Id.  Accordingly,

21   no purpose would have been served by requiring women to register alongside men.  Id.

22   at 79.  Again, "[m]en and women, because of the combat restrictions on women, [were]

23   simply not similarly situated for purposes of a draft or registration for a draft." Id. at 78.[13]

24          [13] The Court also emphasized that Congress enacted the Military Selective Services Act pursuant to
25   its power "To raise and support Armies," "To provide and maintain a Navy," and "To make Rules for the
     Government and Regulation of the land and naval Forces." Rostker, 453 U.S. at 65 (citing U.S. Const.
26   art., I, § 8, cls. 12-14).  Accordingly, Rostker was not "merely a case involving the customary deference
     accorded congressional decision." Id. at 64.  "The case [arose] in the context of Congress' authority over
27   national defense and military affairs, and perhaps in no other area has the Court accorded Congress
     greater deference." Id. at 64-65.  "Not only is the scope of Congress' constitutional power in this area
28   broad, but the lack of competence on the part of the courts is marked." Id.  at 65.  Judicial deference was
     thus at its apogee.  Id. at 70-72.

1    Schlesinger and Rostker stand in stark contrast to the instant case.  In those

2  cases, males and females stood on entirely different footing because females as a class

3  were precluded from serving in particular roles.  There was no question that men and

4  women were not similarly situated.  In this case, to the contrary, male and female ACP

5  applicants that meet the gender-neutral exclusionary criteria are similarly situated.  Any

6  attempt to reach a different result by comparing male applicants to some hypothetical

7  female applicant with children and special social service needs is improper.  Some men

8  may not have children.  Neither may some women.  Some men may not have histories of

9  trauma or abuse.  Neither may some women.  Accordingly, these cases provide

10  Defendants little support.[14]

11    The cases of Michael M. v. Superior Court of Sonoma County, 450 U.S. 464

12  (1981), and Nguyen v. I.N.S., 533 U.S. 53 (2001), are also not helpful to Defendants for

13  essentially the same reason.  In Michael M., the question was whether California's

14  statutory rape law, which made only men criminally liable, was constitutional.  Id. at 466.

15  "The justification for the statute . . . [was] that the legislature sought to prevent

16  illegitimate teenage pregnancies."  Id. at 470.  Accordingly, because "the risk of

17  pregnancy itself constitute[d] a substantial deterrence to young females," the Court

18  reasoned that "[a] criminal sanction imposed solely on males thus serve[d] to roughly

19  'equalize' the deterrents on the sexes."  Id. at 473.  The Court's decision therefore turned

20  on the fact that only women can bear children and thus only women run the risk of

21  pregnancy as a result of intercourse.  See id. at 467-471.

22    Similarly, in Nguyen, the Court considered the constitutionality of a statute that

23  pertained to the citizenship of children born outside the United States to unmarried

24  couples where one parent is an American citizen and one parent is a non-citizen.  Under

25  the statute, the citizenship of the child depended on whether the mother or the father

26

27    [14] Regardless, as the Court has previously emphasized, no showing must be made as to any of this in
order for a female to be accepted to the ACP.  See ECF No. 38 at 9-10.  The Court's prior analysis on that
28  point is again incorporated here by reference.

1    was the United States citizen.  533 U.S. at 56-57.  The Court found the distinction in

2    treatment was justified by two important governmental objectives: (1) "the importance of

3    assuring that a biological parent-child relationship exists"; and (2) "the determination to

4    ensure that the child and the citizen parent have some demonstrated opportunity or

5    potential to develop not just a relationship that is recognized, as a formal matter, by the

6    law, but one that consists of the real, everyday ties that provide a connection between

7    child and citizen parent  and, in turn, the United States."  Id. at 62, 64-65.

8         As to the first interest, the difference in treatment was justified because the

9    biological relationship could be verified as to a mother by the event of birth itself since

10   the mother's status "is documented in most instances by the birth certificate or hospital

11   records and the witnesses who attest to her having given birth."  Id. at 62.  Verification of

12   the paternal relationship, on the other hand, required additional substantiation.  Id. at

13   62-63.

14        The second justification also turned on child-bearing ability:

15              In the case of a citizen mother and a child born overseas, the
               opportunity for a meaningful relationship between citizen
16              parent and child inheres in the very event of birth, an event
               so often critical to our constitutional and statutory
17              understandings of citizenship. The mother knows that the
               child is in being and is hers and has an initial point of contact
18              with him. There is at least an opportunity for mother and child
               to develop a real, meaningful relationship.
19
                The same opportunity does not result from the event of birth,
20              as a matter of biological inevitability, in the case of the unwed
               father.
21

22   Id. at 65.

23        Accordingly, as with Schlesinger and Rostker, where all women were subject to

24   service limitations, Michael M. and Nguyen both turned on the fact that only women are

25   capable of bearing children.  No male and female is similarly situated in that regard,

26   rendering the connection between the challenged statutes and the governmental

27   interests much closer.  In this case, where female offenders are simply "more likely" to

28   ///

1  qualify for or benefit from the ACP, the fit is insubstantial and falls far short of being

2  "exceedingly persuasive."

3      Finally, Defendants' reliance on <u>Kahn v. Shevin</u>, 416 U.S. 351 (1974), and

4  <u>Califano v. Webster</u>, 430 U.S. 313 (1977), is also misplaced.  In <u>Kahn</u>, the Court upheld

5  a state law providing widows, but not widowers, with a $500 tax exemption.  416 U.S. at

6  352.  According to the Court, "[t]here can be no dispute that the financial difficulties

7  confronting the lone woman . . . exceed those facing the man."  <u>Id.</u> at 353.  "Whether

8  from overt discrimination or from the socialization process of a male-dominated culture,

9  the job market is inhospitable to the woman seeking any but the lowest paid jobs."  <u>Id.</u>

10  When <u>Kahn</u> was decided, the median income for female workers was significantly lower

11  and "[w]hile the widower [could] usually continue in the occupation which preceded his

12  spouse's death, in many cases the widow [would] find herself suddenly forced into a job

13  market with which she is unfamiliar, and in which, because of her former economic

14  dependency, she [would] have fewer skills to offer."  <u>Id.</u> at 354.  The Court thus

15  concluded that "[t]here can be no doubt, therefore, that [the State's] differing treatment of

16  widows and widowers 'rest[ed] upon some ground of difference having a fair and

17  substantial relation to the object of the legislation.'"  <u>Id.</u> at 355 (quoting <u>Reed v. Reed</u>,

18  404 U.S. 71, 76 (1971)).

19      <u>Webster</u> dealt with a similar challenge to a Social Security Act provision that

20  "result[ed] in a slightly higher 'average monthly wage' and a correspondingly higher level

21  of monthly old-age benefits for the retired female wage earner."  430 U.S. at 316.  The

22  Court explained: "Reduction of the disparity in economic condition between men and

23  women caused by the long history of discrimination against women has been recognized

24  as . . . an important governmental objective."  <u>Id.</u> at 317.  That statute "operated directly

25  to compensate women for past economic discrimination."  <u>Id.</u> at 318.  Accordingly,

26  "allowing women, who . . . have been unfairly hindered from earning as much as men, to

27  eliminate additional low-earning years from the calculation of their retirement benefits

28  work[ed] directly to remedy some part of the effect of past discrimination."  <u>Id.</u>

1    Kahn and Webster differ from the instant matter because in those cases the

2 Supreme Court recognized the historically arduous journey women had undergone to

3 gain traction as breadwinners in the workforce.[15]  This struggle to break into the

4 workplace likely affected all women, even if some did successfully enter the work force

5 and were able to advance.  There was also no evidence in either case that any men had

6 suffered the same sort of discrimination as women.  Accordingly, Kahn and Webster are

7 much more on par with the cases regarding service limitations and biological differences

8 than the instant case, where even the State appears to concede that some men could

9 benefit from the ACP.[16]

10          **4.     Excluding men from the ACP is not substantially related to the
                     State's interests.**
11

12    On a fundamental basis, the most troubling aspect of the State's arguments is

13 that, even if the ACP is a superior method of approaching recidivism and social issues

14 for some women, and even though the State has offered ample justification for providing

15 the program to female offenders, the State still has not offered any rational explanation

16 for excluding men.  For the State's action to survive equal protection review, there must

17 be some direct or indirect justification for excluding a particular class.  None have been

18 shown here.

19 ///

20 _____

21    [15]  Kahn was also different from this case because it involved taxation.  416 U.S. at 352.  The Court
      itself has "long held that where taxation is concerned and no specific federal right, apart from equal
      protection, is imperiled, the States have large leeway in making classifications and drawing lines which in
22    their judgment produce reasonable systems of taxation."  Id. (citations and internal quotation marks
      omitted).

23
      [16]  The Court notes that all of these latter cases are also distinguishable from Plaintiff's because
24 individualized hearings would not have been helpful.  For example, in Schlesinger or Rostker, where all
      women were precluded from serving in combat positions, the result of any hearing would have been to
25 reach the same conclusion: women were at a disadvantage.  The same follows with regard to Michael M.
      and Nguyen, where the legislation distinguished between men and women based on their ability to bear
26 children.  Again, there can be only one result since men cannot give birth.  Kahn and Webster present a
      closer question because there could conceivably be some women who were not detrimentally affected by
27 the systemic workplace hostility identified by the Supreme Court.  However, this Court can conceive of no
      workable tax or social security scheme that would require each individual female applicant to prove
28 discrimination.  Accordingly, gender was an appropriate proxy for need in part because an individualized
      inquiry would either have been superfluous or unworkable.

1   First, nothing before the Court indicates that permitting men to apply to the ACP

2   will have any direct impact on female applicants.  The State has not argued, for example,

3   that there is limited availability within the program such that admitting men will displace

4   women.  See, e.g., Clark By & Through Clark v. Ariz. Interscholastic Ass'n, 886 F.2d

5   1191 (9th Cir. 1989) (goal of increasing athletic opportunities for women would be

6   undermined if males were permitted to displace females on female interscholastic

7   athletics teams).  Certainly, Defendants have not shown that permitting men to apply to

8   the ACP will directly affect female applicants at all.

9   Nor have Defendants shown any indirect way that female offenders will be

10  impacted by admission of male offenders to the ACP.  This type of showing is typically

11  made in cases where the government has legislated in an attempt to ameliorate the

12  effects of past discrimination or lack of equal opportunities.  See, e.g., Schlesinger,

13  419 U.S. 498; Rostker, 453 U.S. 57; Kahn, 416 U.S. 351; Webster, 430 U.S. 313.  In

14  every case where a gender distinction has been upheld, not only was there some reason

15  to treat one gender more favorably, but there was also a related reason to treat the other

16  gender unfavorably.  Stated another way, the statutes were put in place because one

17  gender had historically enjoyed an advantage at the expense of the other such that there

18  was a valid compensatory justification for leveling the playing field.  See Hogan,

19  458 U.S. at 730 (finding a "policy . . .  invalid . . . because . . . the State ha[d] made no

20  showing that the gender-based classification [was] substantially and directly related to its

21  proposed compensatory objective.").  Given that compensatory objective, a gender-

22  neutral statute would have eviscerated the government's objectives.

23  For example, in Schlesinger, female naval officers were subject to more lenient

24  mandatory discharge provisions to compensate them for the fact that male officers had

25  more advancement opportunities.  419 U.S. 508.  The differential treatment was

26  intended to provide "fair and equitable career advancement programs."  Id. (citations

27  omitted).  The very purpose of the scheme was to level the playing field for male and

28  ///

1  female officers, and permitting males to utilize the more preferential mandatory

2  discharge provisions as well would have undermined the distinction completely.

3      Similarly, in <u>Kahn</u> and <u>Webster</u>, the purpose of the tax and social security

4  preferences for females was to compensate them for disadvantages they had suffered

5  as a result of systemic hostility to women in the workplace.  416 U.S. at 353-55; 430 U.S.

6  at 318-20.  Again, the legislative intent was to compensate females for the fact that

7  males historically had more career opportunities and higher wages than women.  The

8  goal was to take steps to level the playing field, and permitting males to benefit from the

9  same preferences would have mooted that legislative objective.

10      This case is different because no showing has been made either that female

11  offenders have suffered some sort of systemic disadvantage with regard to timely

12  release or that male offenders somehow benefitted at their expense.  In this regard, the

13  instant case is more like <u>Hogan</u> than the above cases on which Defendants rely.  In

14  <u>Hogan</u>, the Court recognized that "[i]n limited circumstances, a gender-based

15  classification favoring one sex can be justified if it intentionally and directly assists

16  members of the sex that is disproportionately burdened."  458 U.S. at 728 (citations

17  omitted).  However, "a State can evoke a compensatory purpose to justify an otherwise

18  discriminatory classification only if members of the gender benefited by the classification

19  actually suffer a disadvantage related to the classification."  <u>Id.</u>  In that case, male

20  applicants denied admission to a female-only nursing school were granted relief

21  because the State made no showing that "women lacked opportunities to obtain training

22  in the field of nursing or to attain positions of leadership in that field."  <u>Id.</u> at 729.

23  Accordingly, "although the State recited a 'benign, compensatory purpose,' it failed to

24  establish that the alleged objective is the actual purpose underlying the discriminatory

25  classification."  <u>Id.</u> at 730.  The "policy [was] invalid . . . because . . . the State ha[d]

26  made no showing that the gender-based classification [was] substantially and directly

27  related to its proposed compensatory objective."  <u>Id.</u>

28  ///

1    <u>Hogan</u> is directly on point.  Here, there has been no showing that male offenders

2    have previously been given opportunities for release or programming that female

3    offenders have not, such that some sort of compensatory system is needed to level the

4    playing field.[17]   Moreover, there has been no showing made that to "compensate" female

5    offenders, males must be excluded from the ACP.  In the present case, on the other

6    hand, female offenders will fully reap the benefits of the ACP even if male inmates are

7    also permitted to apply.  As in <u>Hogan</u>, where permitting men to attend classes had no

8    impact on the female students' educational experience, here there is also no indication

9    in the record that female offenders will be at all affected by the presence of male inmates

10   in the ACP.  In <u>Hogan</u>, the State was unable to show that permitting men to attend the

11   school would interfere with the State's goal.  <u>Id.</u> at 731.  Similarly, here the State has

12   articulated no reason why permitting men to apply to the ACP will prevent the State from

13   continuing to address the programming needs and recidivism issues of female inmates.

14          Moreover, not only has the State failed to provide a sufficient justification for

15   excluding men, but the "use of a gender classification actually produces perverse results

16   in this case."  <u>Orr</u>, 440 U.S. at 282.  In <u>Orr</u>, where husbands but not wives were required

17   to pay alimony, "[the state] statutes [gave] an advantage only to the financially secure

18   wife whose husband [was] in need."  <u>Id.</u>  This is because, "[a]lthough such a wife might

19   have to pay alimony under a gender-neutral statute, the present statutes exempt[ed] her

20   from that obligation."  <u>Id.</u>  "Thus, '[t]he [wives] who benefitt[ed] from the disparate

21   treatment [were] those who were . . . nondependent on their husbands.'"  <u>Id.</u> (internal

22   citations omitted).  "They are precisely those who are not needy spouses and who are

23   least likely to have been victims of . . . discrimination by the institution of marriage."  <u>Id.</u>

24   (internal citations and quotation marks omitted).  "A gender-based classification which,

25   _____

26   [17] The closest Defendants come to raising a successful argument on this theory is that "[t]he ACP
directly targets low-risk female inmates and is therefore substantially related to California legislature's
27   intent to lessen the over-classification of women."  Defs.' Mot. at 12.  Defendants do not explain, however,
how releasing women ameliorates the over-classification problem or how excluding men furthers that
28   objective.

1  as compared to a gender-neutral one, generates additional benefits only for those it has

2  no reason to prefer cannot survive equal protection scrutiny."  Id. at 282-83.

3      Here, assuming the Legislature intended the ACP to ameliorate the undue

4  burdens female inmates have suffered from disproportionate histories of trauma and

5  parenting responsibilities, its disparate treatment of male and female offenders benefits

6  only "those it has no reason to prefer."  Because female applicants need not make any

7  showing that they are in fact caregivers or that they have suffered from any kind of

8  trauma, the individuals who unfairly benefit are the women who are not mothers or

9  caregivers and who have no history of any trauma or abuse.[18]  Accordingly, those

10  women, who may have little use for services, may still apply even though a male

11  offender who may be a caregiver or be able to demonstrate a great need of social

12  services cannot.

13      The disparate impact of the ACP's gender distinction does not end there.  Caban

14  serves to further demonstrate how far-reaching the harms from drawing such an arbitrary

15  line can be.  In Caban, even if children of an unwed father had a substantial relationship

16  with him, they could be adopted by another man without their father's consent.  441 U.S.

17  385-87.  In short, children could have the only father they had known taken from them

18  over their objection and his.

19      The results here are just as harsh.  Based solely on gender distinctions, children

20  of incarcerated mothers may have their mothers returned to them sooner.  Children of

21  male offenders, and the mothers and step-mothers Defendants contend are caring for

22  these children while their fathers are incarcerated, must wait.[19]  Children of these men

23                            ———————————

[18] It is irrelevant whether a particular female offender fitting this classification has been specifically

24  identified.  As indicated above, we know from the legislative history and from Defendants' own evidence
   that not all female inmates are mothers, and it appears not all inmates have suffered the trauma and

25  abuse Defendants contend warrant a sex-based distinction here.  It is thus reasonable to infer from the
   record that some women would be permitted to apply to the ACP despite having little need for services.

26      [19] The Court pauses to note that Defendants' arguments seem to ignore the impact of same-sex
   relationships on their statistics.  All of the Defendants' data seems to make gender distinctions based on

27  presumed heterosexual parenting relationships.  Nothing in the record indicates, however, the number of
   California's inmates that may be in same-sex relationships such that, for example, a female inmate, like a

28  male inmate, may have left her children with a female partner or a male inmate may have left his children

must go two more years without a real chance to repair the parent-child relationship. The children's caretakers, already shouldering the burden of raising children on their own, must wait two additional years before their partner can reintegrate into their children's lives and provide these caretakers with support.

The State offers no sufficient justification for its gender-based differential treatment of children and their caretakers.  Indeed, nothing before the Court is so compelling that it can justify keeping fathers but not mothers from their children.  To the contrary, the legislative history makes clear that the well-being of children of inmates was a primary concern.[20]  Given the legislative findings, it seems incredibly counter-productive to permit reunification for the children of female offenders and to ignore the same needs of children of male offenders.  Additionally, there is no reason that the Court can see to shoulder the caretakers of the children of male prisoners with a greater burden than is put on the caretakers caring for the children of female inmates.[21]

**5.** **The State's gender line also fails for fundamental policy reasons.**

Finally, from this Court's perspective, the ACP's gender distinction and the State's defense of that line seriously undermines some of the most basic precepts of our criminal system; namely, that each defendant, regardless of gender, is a unique individual responsible for his or her own actions.  Treating inmates as homogenous

---

with a male partner.  This distinction makes no difference to the Court for present purposes, but it does seem to undermine the State's presumptions regarding how often fathers are not present such that female offenders have to leave their children with some non-parental family member.  To the contrary, it is entirely possible that some female inmates may have left their children with another mother or step-mother, and some men may have left children with a father or step-father.

[20] See SB 1266 § 1(g) ("Separating parents from children has a substantial impact on their futures. Children of inmates are much more likely than their peers to become incarcerated . . . Research also demonstrates that a father's involvement in his child's life greatly improves the child's chances for success.  Helping incarcerated fathers foster stronger connections with their children, where appropriate, can have positive effects for children.  Strong family connections help to ensure that fathers stay out of prison once they are released.")

[21] Indeed, this seems to perpetuate the myth that fathers are incompetent and incapable of caring for children without mothers, while saddling mothers with greater burdens than they necessarily need carry.  The Court is loath to go down this path.

1   based solely on their gender invidiously contributes to the misconception that inmates

2   lack intrinsic worth as individual human beings.

3         This Court is no stranger to criminal proceedings, having presided over both state

4   and federal criminal cases for nearly twenty years and managing a heavy criminal

5   caseload to this day.  Every offender has his or her own story and is treated as an

6   individual based on his or her background and circumstances, his or her infractions, his

7   or her attitude and acceptance of responsibility, and his or her choices.  This Court has

8   sentenced female offenders who stand in stark contrast to those described by

9   Defendants:  women who were highly educated and professional, with no histories of

10  abuse, but who simply made poor decisions.  So too, the Court has sentenced men who,

11  by all accounts, were doting and involved fathers, men who had been subjected to

12  horrendous abuse, and men who, with help, will likely never set foot in a criminal

13  courtroom again.  It goes without saying that this Court would be breaching its sworn

14  duty to uphold the Constitution if it determined, without regard to any of those factors,

15  that its sentences for male offenders should be two years longer than the sentences it

16  would normally impose as for females.

17        More fundamentally, though, adopting Defendants' argument, would stigmatize,

18  although in different ways, every criminal defendant that appears before the Court.  The

19  Court would have to treat female defendants as a class as victims, at least partly

20  powerless over their situations, patronizing them with more lenient sentences intended to

21  compensate them for their perceived inferiority with respect to their ability to overcome

22  their particular circumstances.  It would have to categorically view male defendants as

23  dangerous and aggressive, with no real regard for their families, punishing them for their

24  perceived inferiority with respect to the potential for rehabilitation and family reunification.

25  In competing ways, members of each gender would be cast as innately inferior to the

26  other.  Certainly there is no place for this type of stereotyping in criminal sentencings,

27  and the Court sees no principled reason why the State should be allowed to employ

28  ///

1   these stereotypes when evaluating offenders for release.  The State cannot use gender

2   as a basis to grant or deny its citizens their freedom.

3   **B.    The provision excluding men from applying to the ACP must be
        stricken.**

4

5       Having determined the ACP's gender distinction is unconstitutional, the Court

6   must now determine the appropriate remedy.  Defendants argue that "[i]f this Court

7   determines the ACP, as presently implemented, is unconstitutional, the Court cannot

8   simply remove the term 'female' from the statute."  Defs.' Mot. at 16.  According to

9   Defendants, such action would be contrary to the legislative intent because the

10  Legislature never meant to create an alternative custody program for all men.  See id.  In

11  addition, Defendants contend that even though the statute includes a severability clause,

12  the legislature did not consider that clause when it amended the statute to apply only to

13  female offenders and thus did not intend that the severability clause would apply to the

14  amended statute.  Id. at 16-17 (citing Cal. Penal Code § 1170.05 ("If a phrase, clause,

15  sentence, or provision of this section or application thereof to a person or circumstance

16  is held invalid, that invalidity shall not affect any other phrase, clause, sentence, or

17  provision or application of this section, which can be given effect without the invalid

18  phrase, clause, sentence, or provision or application and to this end the provisions of

19  this section are declared to be severable.")).  Defendants' arguments are not well taken.

20      In equal protection cases, the Court has two choices:  "[It] may either declare [the

21  statute] a nullity and order that its benefits not extend to the class that the legislature

22  intended to benefit, or it may extend the coverage of the statute to include those who are

23  aggrieved by the exclusion."  Welsh v. United States, 398 U.S. 333, 361 (1970) (Harlan,

24  J., concurring in the result).  "Although the choice between extension and nullification is

25  within the constitutional competence of a federal district court, and ordinarily extension,

26  rather than nullification, is the proper course, the court should not, of course, use its

27  remedial powers to circumvent the intent of the Legislature and should therefore

28  measure the intensity of commitment to the residual policy and consider the degree of

1  potential disruption of the statutory scheme that would occur by extension as opposed to

2  abrogation." <u>Heckler v. Mathews</u>, 465 U.S. 728, 739 n.5 (1984) (internal citations and

3  quotation marks omitted).

4        Expansion of the ACP is consistent with Senate Bill No. 1266's findings that

5  support the reunification of fathers with children and of parenting and family reunification

6  more generally.  <u>See, e.g.</u>, § 1(g)-(h).  This remedy is also consistent with section

7  1170.05's severability clause, requiring that a severed, invalid provision "shall not affect"

8  application of the rest of the statute.  <u>See</u> Cal. Penal Code § 1170.05(p).  The Court has

9  no doubt that the California Legislature anticipated this decision, especially since it

10 chose to leave the statutory severance provision intact.  Even more importantly,

11 however, is the fact that nullifying the ACP in its entirety would disrupt the reunification

12 process by removing all current female ACP participants from their families and

13 communities and returning them to prison.  <u>See Califano v. Westcott</u>, 443 U.S. 76, 90

14 (1979) (finding that where district court chose extension of welfare benefits to previously

15 excluded class, "equitable considerations surely support its choice" given that "an

16 injunction suspending the program's operation would impose hardship on beneficiaries

17 whom Congress plainly meant to protect"); <u>Wauchope v. Dept. of State</u>, 985 F.2d 1407,

18 1417 (9th Cir. 1993) ("No one has suggested here that [the defect] be remedied by

19 invalidating the statute, thereby stripping citizenship from the foreign-born offspring of

20 male citizens").  The appropriate solution here is to open the ACP to qualifying male

21 inmates rather than nullify its provisions altogether.

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1

**CONCLUSION**

2

3        California's decision to open an alternative custody program to female inmates

4    only and to permit them to apply for release up to two years prior to their earliest

5    possible release date violates the Equal Protection Clause of Fourteenth Amendment to

6    the United States Constitution.  Accordingly, for all of the reasons stated above,

7    Defendants' Motion for Summary Judgment (ECF No. 51) is DENIED, and Plaintiff's

8    Motion for Summary Judgment (ECF No. 50) is GRANTED.  The Motions to Strike filed

9    by both sides (ECF Nos. 56, 60) are DENIED as well.

10        Defendants are hereby enjoined and prohibited from applying and/or enforcing

11    the female-only provisions of California Penal Code § 1170.05(a) and (c) in the

12    implementation and administration of the ACP.  CDCR shall immediately cease denying

13    admission to the ACP on the basis that an applicant is male.  Male prisoners shall be

14    accepted into the ACP if they are otherwise eligible under Penal Code section  1170.05

15    and the implementing regulations.  Within thirty (30) calendar days of the electronic filing

16    of this Order, CDCR shall modify its website and any application forms, regulations, and

17    materials provided to prisoners and the public about the ACP to remove any reference to

18    the requirement that a prisoner must be female to apply or participate.  This Order shall

19    apply to Defendants, their agents, employees, successors in office, and all persons with

20    knowledge of it.  No person who has notice of this injunction shall fail to comply with it,

21    nor shall any person subvert the injunction by any sham, indirection, or other artifice.

22    The Court retains jurisdiction to enforce the terms of this injunction.

23        IT IS SO ORDERED.

24    Dated:  September 8, 2015

25

26

27    _____
      MORRISON C. ENGLAND, JR., CHIEF JUDGE
28    UNITED STATES DISTRICT COURT